[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10285
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cr-00309-WTM-GRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BLAKE SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(November 14, 2017)

Before HULL, WILSON, and MARTIN, Circuit Judges.

PER CURIAM:

Blake Smith appeals his 92-month sentence after pleading guilty to one count of possession of a stolen firearm in violation of  18 U.S.C. § 922(j).  Smith argues that the district court clearly erred in increasing his sentence based on its finding that he committed aggravated assault.  This finding resulted in a four-level enhancement for possession of a firearm in connection with another felony offense under United States Sentencing Guideline § 2K2.1(b)(6)(B).  After careful review, we affirm.

## I.

## A.

On January 30, 2016, a young boy called police to report a fight between his parents.  When the officers arrived, they first saw the boy waving at them from an upstairs window.  After knocking several times, Keatrice Boone answered the door.  The officers noted Smith standing right behind her and that Boone appeared "rigid and fearful."  Although Boone told the officers that everything was fine, she gave them "a nonverbal signal to indicate otherwise."

The officers interviewed Smith, Boone, and the boy.  The boy reported that when Smith arrived at the home, he asked who else was there and walked upstairs and looked around.  The boy told the officers he heard anger in Smith's voice and was scared.  He stated that Boone, his mom, told him to go hide in his bedroom closet on the second floor and call the police.  The boy said he did as his mother

2

instructed, and as a result he didn't see or hear anything else that happened because he was in the closet. The boy told the officers he didn't see Smith bring anything into the home that day, but Smith had brought a firearm to the house about two weeks prior.

Smith and Boone gave different accounts of what happened between them.

<u>Boone</u>

Boone said she reached out to Smith and asked him to meet with her to talk about their relationship. When Boone met Smith, he got into her car, put a gun to her head, and told her she better take him to get his things or he would kill her. Boone did as she was told, driving to the house.

When Boone unlocked the front door, Smith pushed her aside and took his gun out of his waistband. He then asked Boone if anyone else was in the house, and began checking all the rooms, stating that he knew Boone had someone there. Boone repeatedly asked Smith to put the gun away. Smith ignored her requests, continued searching the house, stating, "I don't give a fuck, I'll kill everybody in here." Boone said she then gave her son the phone and asked him to call the police.

Smith returned to the first floor, and sat down on a couch with a gun in his lap. Boone again asked Smith to put the gun away, as their 3-year-old daughter was in the room too. Smith complied and put the gun in his waistband. However,

3

he then moved the couch away from the wall and retrieved a shotgun, which he pointed at Boone.

Boone said Smith then heard police radios outside. He hid the shotgun in a closet and went into the kitchen. When he returned, he tried to stop Boone from answering the door. Boone explained to him that the officers already knew they were here so it was best to open the door. Smith told her "she better tell them that everything was okay."

Smith

Smith's story began a day earlier, on January 29, 2016. He told the officers that Boone went through his cellphone and found out he'd been talking to another woman. As a result, she told him to get his things and leave the house. As Smith went upstairs, Boone grabbed a shotgun and fired it in Smith's direction, causing a large hole in the ceiling. Boone was emotional, repeatedly asking, "Why her?" in reference to the other woman.

Smith left then, but returned later that day because "'something' told him to come back." Smith stated he found Boone on the sofa, crying and with a firearm pointed towards her mouth. Smith grabbed the firearm and called Boone's mother to come over. He left when Boone's mother arrived.

The next day, Boone reached out to Smith to arrange a meeting to talk about their relationship. Smith stated that when they met, Boone tried to run him over

4

with her car.  Even so, he agreed to go with Boone because she said she just wanted to talk and because there was a little boy present who "did not need to see that."  When they arrived at the house, Smith stated he began searching for Boone's ex-boyfriend because he and the ex-boyfriend had an ongoing dispute and he was worried that Boone may have "set him up."

Smith said that after a short while, Boone went into the kitchen and returned with a firearm.  Boone asked, "You think this shit is a fucking game?"  She also asked, "Why am I not enough?"  Boone walked towards Smith with the gun pointed at his head.  Smith reached for the gun and took it away from her.

Smith said that as he was leaving, there was a loud knock on the door.  He said Boone then gestured for Smith to leave by way of the back door, but that he refused.  Smith told Boone he had just reported to his parole officer and was not going to run from anyone.  Smith then placed the gun he'd taken from Boone under the sink.  As he opened the front door, he realized Boone had called the police.  During police questioning, Smith denied carrying guns.

After Smith's arrest, the police searched the house and found a shotgun in a closet and a revolver under the kitchen sink.  The officers observed that the damage to the ceiling was not consistent with Smith's claim that Boone fired the shotgun at him and hit the ceiling.  Although Smith said there were witnesses to Boone's attempt to run him over with her car, the officers' efforts to contact these

5

witnesses were unsuccessful. The officers also wore body cameras during the events. The footage from those cameras contradicted Smith's version because it showed Boone answered the door with Smith behind her.

## B.

Smith pled guilty to one count of possession of a stolen firearm. In the presentence investigation report ("PSR"), the probation officer included a complete recounting of both Boone's and Smith's versions of the events. The probation officer also applied a four-point enhancement for possession of a firearm in connection with another felony offense, determining that Smith's firearm possession was in connection with an aggravated assault. With this enhancement, Smith's total offense level was 23.

Smith's lawyer objected to this enhancement because it was based on the unreliable statements of Boone. He produced exhibits which he argued shored up Smith's account and detracted from Boone's credibility. Smith's lawyer also argued that without Boone's statements, there was no evidence of an aggravated assault because the only other witness was the boy, who said that Smith came in the house with nothing and that he saw and heard nothing because he was in the closet. The probation officer filed an addendum to the PSR, responding to Smith's objection. The addendum specifically identified Boone's grand jury testimony, in which she described Smith's threats to her life while he was holding a firearm, as

being sufficient to meet the preponderance of the evidence standard required to impose the enhancement.

At sentencing, the district judge acknowledged Smith's objection, stating he had read the PSR, the addendum, and Smith's sentencing memorandum and its exhibits. When asked by the district judge "if there's anything else that you wish to call to the Court's attention regarding factual accuracy of the report or the probation officer's application of the Sentencing Guidelines," Smith's lawyer said he had no other objections. The district judge then adopted the statements in the PSR as fact, and ruled that he "concurs with the findings in the [PSR], including the addendum, and determines that the applicable Advisory Guidelines are a total offense level of 23."

The court invited the parties to advocate for the sentence they deemed appropriate. During the government's argument for a sentence near the top of the Guideline range, its lawyer discussed Boone's statements that Smith had pointed a gun at her. The district judge noted that "the only person that backs up what you're saying now about what the defendant did is Ms. Boone's testimony" and that Boone had "an axe to grind with the defendant." The district judge also stated,

> But part of the problem that the defendant has in this case is that he gave such an incredible story to the officers when the officers got there and talked about getting the shotgun and shooting a hole in the roof and all that stuff, and physically none of that—none of his story matched up.

After hearing from both parties, the district judge sentenced Smith to ninety-two months in prison and three years of supervised release.

## II.

## A.

We review a sentencing court's findings of fact for clear error. United States v. Gupta, 572 F.3d 878, 887 (11th Cir. 2009).  A finding is clearly erroneous if, after reviewing all the evidence, we are "left with the definite and firm conviction that a mistake has been committed."  Id. (quotation omitted).  A factfinder's choice between "two permissible views of the evidence . . . cannot be clearly erroneous."  United States v. Smith, 821 F.3d 1293, 1302 (11th Cir. 2016) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985)).  A "permissible view" is an "account of the evidence [that] is plausible in light of the record viewed in its entirety."  Anderson, 470 U.S. at 574, 105 S. Ct. at 1511.

When determining if factors exist that favor enhancing a defendant's sentence, the court may consider any information, regardless of its admissibility at trial, so long as the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence.  United States v. Ghertler, 605 F.3d 1256, 1269 (11th Cir. 2010).  A district court's failure to make explicit findings as to reliability, however,

8

"does not necessarily require reversal or remand where the reliability of the statements is apparent from the record." United States v. Gordon, 231 F.3d 750, 761 (11th Cir. 2000).

## B.

Here, when the district court determined that Smith's final offense level was 23, it made an implicit finding that Boone's statement and grand jury testimony were reliable and that Smith had possessed the gun in connection with an aggravated assault. "While it may be advisable and in some instances necessary for a district court to make distinct findings regarding the reliability of hearsay statements used at sentencing," the district court's failure to do here does not require reversal or remand because the reliability of the statements is apparent from the record. See id.

First, Boone's statement and her grand jury testimony were consistent with each other. Second, the police officers' observations matched more closely with Boone's statement and testimony than with Smith's. For example, the police found the shotgun in the closet and the revolver in the kitchen—exactly as Boone described. The footage from the officers' body cameras also supported Boone's statement that she answered the door, with Smith standing behind her, and not the other way around. The officers noted that Boone appeared "rigid and fearful"

when she answered the door, consistent with her statement and testimony that Smith had threatened her with a gun.

Third, as the district court noted, Smith's statement was too incredible to be believed. The officers did not find damage to the ceiling that was consistent with shotgun fire and they could not find any of the witnesses to Boone's supposed attempt to run Smith over with her car. Finally, in contrast to Smith's statement that he didn't carry guns, the boy told officers that Smith had brought over a firearm two weeks earlier.

Viewing the record in its entirety, the district court's decision that Boone's statement and testimony were credible does not leave us with a "definite and firm conviction" that a mistake has been made. See Gupta, 572 F.3d at 887. Beyond that, it produces an account of the evidence that is plausible in light of the record viewed in its entirety. See Anderson, 470 U.S. at 573–74, 105 S. Ct. at 1511. The district court's choice therefore cannot be clearly erroneous. See Smith, 821 F.3d at 1302.

**AFFIRMED.**